**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| _____ | : | |
| MIRNA JUDITH RODRIGUEZ CARNELLI, | : | Civil No. 10-3083 (SRC) |
|  | : | |
| Petitioner, | : | |
|  | : | **OPINION** |
| v. | : | |
|  | : | |
| TANCREDO ANTONIO CANABE PAZ, | : | |
|  | : | |
| Respondent. | : | |
| _____ | : | |

**CHESLER, District Judge**

This matter comes before the Court upon the Petition filed by Mirna Judith Rodriguez Carnelli ("Petitioner") for the return of her minor child, pursuant to the Hague Convention of the Civil Aspects of International Child Abduction, 19 I.L.M. 1501 (1980) (hereinafter, the "Convention") and the International Child Abduction Remedies Act, 42 U.S.C. § 11601, *et seq.* (hereinafter, "ICARA") [docket entry 1]. No answer having been filed by Respondent Tancredo Antonio Canabe Paz ("Respondent") within the time provided by the Federal Rules of Civil Procedure, Petitioner filed a motion for default judgment [docket entry 8]. At that point, Respondent did enter an appearance through counsel, opposed the motion for default judgment and filed an Answer to the Petition. The Court thereafter held a hearing on the Petition and heard witness testimony and the argument of counsel on January 18, 2011 and again on May 3, 2011. The somewhat protracted time frame in which this matter was addressed can be attributed to the parties' ongoing efforts to resolve their dispute amicably and to Petitioner's requests that the

continued hearing date be adjourned in light of her efforts to secure a visa to travel to the United States to attend the hearing. Having considered the papers filed by the parties and the evidence presented at the hearing, this Court concludes that the Petition must be denied based on the Convention's "wishes of the child" exception.

I.   **BACKGROUND**

Petitioner and Respondent, both natives of Uruguay, were married on May 3, 1988 in Uruguay. In June 1988, Respondent emigrated to the United States, and his wife and young daughter, Virginia, followed in 1990.[1] The family settled in Kearny, New Jersey. On September 20, 1996, Daniel was born in Belleville, New Jersey. The family resided together in Kearny until 2002, when Petitioner and Respondent separated. At that point, Petitioner and her children continued to live in Kearny, New Jersey, while Respondent resided in a separate home in the neighboring town of Harrison.

When Petitioner lost her job at a bank in 2004, she was unable to find new employment, a circumstance she attributes to her immigration status. Through personal connections, she was, however, offered a job in Mallorca, Spain. Her emigration to Spain required her to depart from her native Uruguay, where she was a citizen and could obtain the necessary travel authorization. Prior to departing for Uruguay in or about January 2005, she and Respondent reached an agreement regarding the minor children: Virginia would live in the United States in Respondent's

---

[1] Virginia was born on October 7, 1988 in Uruguay. She is an adult and not the subject of this Petition.

2

care and Daniel would remain with his mother.  Petitioner and Respondent jointly obtained a United States passport for Daniel's international travel to Uruguay, and then to Spain.

While in Uruguay, Petitioner sought to dissolve her marriage with Respondent.  She secured counsel for the absent Respondent.  Petitioner maintains that she informed Respondent of her intention to file for divorce. Respondent, in contrast, contends that he did not become aware of the divorce proceedings until receiving a telephone call from an individual who identified himself as an attorney and informed Respondent that he would be sending papers to finalize the divorce.  Although Respondent also contends that he did not consent to the divorce, he does admit that he signed the divorce documents.  The Uruguayan court entered a Divorce Decree terminating the marriage of the parties on or about September 28, 2005.   It included a custody agreement, whereby Respondent would continue to exercise custody over Virginia and Petitioner would exercise custody over Daniel.

Petitioner and Daniel moved to Spain, where they remained until January 2009.  At that time, a loss of employment, which Petitioner attributes to an economic downturn, once again prompted Petitioner to relocate.  She was offered a job in London, and so in or about January 2009, Petitioner, Daniel, and Petitioner's second husband, whom she married on September 23, 2008, moved to the United Kingdom.  The record shows that, per a signed authorization transmitted from the Uruguayan Consulate in New York to the Uruguayan Consulate in Palma de Mallorca, Respondent consented to Daniel's residence in Spain and the United Kingdom in the custody of Petitioner.

In or about July 2009, Daniel traveled from the United Kingdom to the United States to spend the summer with his father, as he had done every year since leaving the United States in

3

2005.  While Daniel was visiting Respondent, Petitioner's husband returned to his native Argentina upon the death of his mother, and Petitioner soon relocated there to help her husband care for his ailing father.  Petitioner informed Respondent of her situation and asked that he keep Daniel in his care until she was able to sort out her residency, which was necessary for Daniel to obtain his own Argentine residency.  She admits that she agreed to his enrollment in school in New Jersey, given the uncertainty regarding how long it would take for her residency to be approved but stressed that she made it clear to Respondent that Daniel should be returned to her once she obtained residency.  When the residency was approved on October 15, 2009, Petitioner asked for Daniel to return but Respondent refused.  Petitioner claims that at that point, she began to encounter consistent difficulty in establishing contact with Respondent and ultimately was unable to establish contact at all.

Daniel has remained in the physical custody of his father since July 2009 to the present. Petitioner filed a child restitution petition under the Convention with the United States Embassy in Argentina on November 20, 2009.  Following failed efforts to resolve the custody dispute, Petitioner filed the instant Petition in this Court on June 16, 2010.  At that time, Daniel was 13 years old.  He is currently 14.

At the hearing, the Court heard testimony from a number of witnesses, most significantly, from Petitioner and Daniel.

## II.   DISCUSSION

Petitioner is seeking the return of Daniel on grounds that his father illegally retained their son in the United States and refused to return him to her in Argentina in violation of her custody

rights.  This Court has jurisdiction over this matter pursuant to 42 U.S.C. § 11603, which authorizes district courts to decide matters arising under the Convention.  ICARA, the statute implementing the Convention in the United States, further specifies that a court's jurisdiction is limited to "determin[ing] only rights under the Convention and not the merits of any underlying child custody claims."  42 U.S.C. § 11601(b)(4).

The Convention provides for the return of a child wrongfully retained in any "Contracting State."[2]  (Convention, art. 1).  In relevant part, it directs that "where a child has been wrongfully removed or retained in terms of Article 3 . . . the authority concerned shall order the return of the child forthwith."  (*Id.*, art. 12.)  Under Article 3, "wrongful" retention occurs when:

> a. it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> b. at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

(Convention, art. 3.)  The burden is on the petitioner to demonstrate by a preponderance of the evidence that the retention of the child was wrongful.  42 U.S.C. § 11603(e)(1)(A).

---

[2] The Convention can only operate between signatory states.  *See United States v. Amer*, 110 F.3d 873, 881 (2d Cir. 1997) (citing Convention, Art. 1).  Here, though no party has raised this issue, the Court notes that all countries involved - the United States, the United Kingdom and Argentina - are signatories to the Convention. *See* U.S. Dep't of State Hague Abduction Convention Country List, http://travel.state.gov/abduction/resources/congressreport/ congressreport_1487.html (last visited May 17, 2011); *see also* T.I.A.S. No. 11670 (Nov. 7, 1988) (reporting ratification of Convention by United States).

The Court finds that Petitioner has met this burden.   Third Circuit jurisprudence instructs that to determine a claim under Article 3 of the Convention, the Court should typically consider four issues:

> (1) when the removal or retention at issue occurred;
>
> (2) the country in which the child was habitually resident prior to the removal or retention;
>
> (3) whether the removal or retention breached the custody rights of the petitioner; and
>
> (4) whether the petitioner was exercising those custody rights at the time of the removal or retention.

*Baxter v. Baxter*, 423 F.3d 363, 368 (3d Cir. 2005).  The record is clear that the retention occurred in or about October 2009, when, according to Petitioner's testimony, she asked that Daniel be returned to her and Respondent failed to comply with her wishes.  Petitioner concedes that the United Kingdom was the child's place of habitual residence, and it appears that the record supports such a finding.  The term "habitual residence" is not expressly defined in the Convention, but the Third Circuit has held, based on interpretation of the Convention and its aims, that it is "the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective." *Id.* (quoting *Feder v. Evans-Feder*, 63 F.3d 217, 224 (3d Cir. 1995)).  Immediately before his retention in the United States by his father, Daniel had been living in the United Kingdom.  Though he had only lived there for approximately seven months before traveling to the United States for his summer visit, it appears that, from Daniel's perspective when he moved

6

there in January 2009 and when he left for New Jersey, it was to remain his permanent residence. His mother had secured employment in London, and he had been enrolled in a British school. The record also carries Petitioner's burden to show that the October 2009 retention breached her custody rights and that she was exercising those rights at that time.  The parties had entered into both an oral and written agreement on custody, the latter of which is memorialized in the Uruguayan divorce decree, giving Petitioner custody of Daniel. Petitioner has also provided legal authority that the United Kingdom, the state of Daniel's habitual residence, would honor the divorce decree.[3]  Daniel's summer visit in 2009 with Respondent was consistent with the parties' custody agreement, and Petitioner's request for Daniel's return shows her exercise of her custody rights.  Moreover, the parties' course of conduct between 2005 and 2009, when the retention occurred, evidences their mutual assent to such a custody arrangement.

Although Respondent has endeavored to challenge the validity of the Uruguayan divorce decree, it remains that he signed the documents on which the divorce was based.  Those documents included a provision concerning the custody arrangement he and his wife appear to have negotiated and orally agreed upon prior to Petitioner's departure from the United States with Daniel in 2005.  Respondent has presented no legal authority which would indicate that his failure to be present before the Uruguayan tribunal at the time of the divorce or other aspect of the divorce proceedings would somehow invalidate the divorce decree. Regardless of whether the

---

[3] Petitioner cites to the British Family Law Act of 1986.  Sections 45 and 46 of that act provide, in relevant part, that subject to certain exceptions which do not apply here, the validity of a divorce obtained in a foreign country shall be recognized in the United Kingdom if the divorce is effective under the law of the country in which it was obtained and, at the relevant date, either party to the marriage was a national of the foreign country.  See Family Law Act of 1986, http://www.legislation.gov.uk/ukpga/1986/55 (last visited May 18, 2011).

Uruguayan divorce decree effectively dissolved the marriage between Petitioner and Respondent - and, incidentally, the Court discerns no reason why it would not be binding - the parties' agreement establishes by a preponderance of the evidence that Petitioner had the right of custody with respect to Daniel.  The Convention is clear that custody rights may arise in a number of ways: "by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of [the state of the child's habitual residence]. Convention, art. 3.

Petitioner's request that Daniel's visitation with his father be extended while she established her Argentine residence does not, moreover, negate her exercise of her custody rights. The Third Circuit has held that a "petitioner can show the exercise of custody rights by demonstrating that he or she kept or sought to keep, some sort of regular contact with the child." *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 277 (3d Cir. 2007) (citing *Baxter*, 423 F.3d at 370).  It has stressed that "nothing short of clear and unequivocal abandonment will prove that the petitioner failed to exercise his or her custodial rights." *Id.*  The record demonstrates that Petitioner was clear that the altered arrangement would be temporary and that she expected Daniel to return to her physical custody upon her request when Argentina granted her residency, a request she in fact made promptly in October 2009.

Having found a wrongful retention, the Court must note that this case presents a slightly unusual situation with regard to the interplay between Article 3, which sets forth the standard for wrongful removal or retention, and Article 12, which directs the return of the child forthwith if that standard is met.  The country in which Daniel was habitually resident immediately before his wrongful detention - which Petitioner concedes was the United Kingdom - is not the country to

8

which Petitioner seeks he be returned. Petitioner relocated to Argentina after Daniel traveled to

the United States.  Nor is Argentina a place Daniel ever called home, such that his return to his

mother would effect the Convention's goal of having custody disputes resolved in the home

country, as opposed to the place where the child has been wrongfully removed or retained.  *See*

Convention preamble.  The Supreme Court has observed that

> [t]he Convention is based on the principle that the best interests of the
> child are well served when decisions regarding custody rights are made in
> the country of habitual residence . . .  Ordering a return remedy does not
> alter the existing allocation of custody rights, . . . but does allow the courts
> of the home country to decide what is in the child's best interests.

*Abbott v. Abbott*, 130 S.Ct. 1983, 1995 (2010).  Petitioner argues that the discrepancy between

the country of habitual residence, as defined by the Convention, and the country to which she

seeks Daniel's return should not foreclose the relief she seeks because Article 12 of the

Convention is, in fact, deliberately silent on the matter of where the return of a wrongfully

removed or retained child should be ordered.  Petitioner appears to be correct.  Article 12 simply

provides that "the authority concerned shall order the return of the child forthwith," without

specifying, as the preamble to the Convention contemplates, that the return be to the country of

habitual residence.  *Compare* Convention preamble *with* Convention art. 12; *see also Von*

*Kennell Gaudin v. Remis*, 282 F.3d 1178, 1182 (9th Cir. 2002) (noting that Convention does not

make clear to what country a child must be returned and pointing out difference between

Convention's preamble and its actual text). The Convention's official commentary, cited by

Petitioner in support of her argument, bears out the view that a court handling a Convention

claim may order the return of a child to the custodial parent even if the parent is not in the place

of the child's habitual residence.  *See* Elisa Perez Vera, Explanatory Report ¶ 110, in 3 Hague

Conference on Private International Law, Acts and Documents of the Fourteenth Session, Child

Abduction 459-60 (1982).  Summarizing the relevant section of the official commentary, the

Ninth Circuit Court of Appeals observed as follows:

> The commentary explains that the Convention rejected a proposal that
> would have required a child to be returned to his habitual residence. The
> Convention was concerned that such a proposal would prove "inflexible"
> when the petitioner moves from the State of the child's habitual residence
> post-abduction. In other words, the Convention did not provide that a child
> be returned to his pre-abduction habitual residence if the petitioner had
> relocated to a different country. The Commentary states that the
> Convention intended that the child be transferred to the petitioner's new
> residence in these circumstances.

*Von Kennell Gaudin*, 282 F.3d at 1182-83 (internal citations omitted).

Though the Court agrees with Petitioner's argument that it is authorized under the

Convention to return Daniel to his mother's custody in Argentina, this issue, while a significant

one, is rendered largely academic in this case because a petitioner's right to the return of the child

is not absolute.  Article 13 of the Convention sets forth a number of grounds upon which a court

may deny an order of return, in its discretion, if a respondent proves one of these "affirmative

defenses."  *Tsai-Yi Yang*, 278 F.3d at 278.  In this case, the Court finds that Respondent has

proven, by the required preponderance of the evidence standard, that Article 13's "wishes of the

child" defense applies.  *See id.*

Article 13 provides that "[t]he judicial or administrative authority may also refuse to

order the return of the child if it finds that the child objects to being returned and has attained an

age and degree of maturity at which it is appropriate to take account of its [sic] views."  Daniel

unequivocally testified that he wishes to remain in the United States with his father. There is no

set age under the Convention at which a child is deemed to be sufficiently mature; rather, the

Third Circuit guides that the district court hearing the matter must make this fact-intensive determination on a case-by-case basis. *Tsai-Yi Yang*, 499 F.3d at 279.  Daniel, who is 14, expressed his wishes to stay with his father in a cogent and well-reasoned manner.[4]  He explained that he enjoyed meaningful and close relationships with many family members also living in or near his father's home in Kearny, New Jersey, including specifically his sister, Virginia, his cousin Michael and his Aunt Betsy.  He also testified that he is happy with his schooling as a student in Kearny High School, where he enjoys friendships and, as the records demonstrate, has achieved good grades.  In contrast, he described an itinerant and somewhat lonely lifestyle with his mother.  He also testified that while he speaks a little Spanish, he is not fluent in the language, which further provides a reasoned basis for his desire to remain with his father in the United States.  Moreover, there is no indication that Daniel's wishes to remain with his father are somehow the product of undue influence by his father or some other family member or third-party. The Court also notes that his wishes do not appear to arise from a teenager's rebellious streak or some aversion to his mother.  Indeed, Daniel made it very clear that he loves both of his parents and wishes to have a harmonious relationship with both of them.  His preference to remain in the United States with his father would seem to stem, rather, from a desire for a more stable lifestyle than his mother was able to provide.

Petitioner draws attention to the fact that during this period of time that Daniel has been living with his father, it has been very difficult for her to contact Daniel and that, moreover, the infrequent contact she does have with him (mostly over computer chats, as opposed to telephone)

---

[4] The Court further notes that, while not dispositive of the child's maturity, Daniel's age places him very near the age at which the Convention no longer applies, that is, age 16. Convention, art. 4.  Indeed, Daniel's 15th birthday, on September 20, 2011, is only months away.

has been strained.  She has indicated her belief that this breakdown of communication with her son evidences Respondent's efforts to alienate Daniel from Petitioner.  The Court has reviewed the testimony and evidence related to this issue very carefully.  It observes that, indeed, communication between Petitioner and her son has been lacking.  Daniel does in fact display feelings of resentment toward his mother, but based on his testimony, the Court understands this tension to stem from Daniel's frustration with his mother's lack of candor with respect to her pursuit of this Petition and her role in the commencement of an ultimately unsubstantiated child welfare investigation by New Jersey's Division of Youth and Family Services.  The Court listened attentively to Daniel's testimony, and it did not perceive the communication problems between Daniel and Petitioner to be indicative of any manipulation by Respondent of Daniel's thoughts and feelings but rather of the boy's difficult position in which he is caught in a tug-of-war between his adversarial parents.  The Court has weighed this unfortunate circumstance and concludes that it does not diminish the reasonableness of Daniel's wish to remain in the United States with his father.

In short, the Court finds that Daniel presented as a thoughtful and intelligent young man, who, at the age of 14, has demonstrated a degree of maturity at which it is appropriate for this Court to consider his views regarding whether to stay with his father or be returned to his mother. This case warrants application of the "wishes of the child" exception to the mandatory return of a wrongfully retained child under the Convention.  Accordingly, the Court will deny the Petition under Article 13 of the Convention and the implementing statutory provision, 42 U.S.C. § 11603(e)(2)(B).

The Court wishes to make clear, however, that in ruling on the instant petition pursuant to the Convention and ICARA, it has not made any determinations as to the merits of the parties' apparent custody dispute.  That is neither the goal of the Convention nor the role of this Court under the authority granted by the Convention and ICARA.  *See* Convention, art. 19 ("A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody dispute); 42 U. S. C. § 11601(b)(4) ("The Convention and this chapter empower courts in the United States to determine only rights under the Convention and not the merits of any underlying custody claims."); *see also Carrascosa v. McGuire*, 520 F.3d 249, 260 (3d Cir. 2008) (holding same).

## III.   CONCLUSION

For the foregoing reasons, the Court will deny the Petition, dismiss the pending motion for default judgment as moot and close the case.  An appropriate form of Order will be filed herewith.

                                      s/Stanley R. Chesler
                                     STANLEY R. CHESLER
                                     United States District Judge

DATED: May 19, 2011

13